**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NAR BUSINESS PARK, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-6223 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| OZARK AUTOMOTIVE | ) | |
| DISTRIBUTORS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Defendant's motion for summary judgment [95] and Plaintiff's cross-motion for partial summary judgment [105] on Plaintiff's Counts I and II; Plaintiff's [113] and Defendant's [115] cross motions for summary judgment on Defendant's two counterclaims; and Plaintiff's motion for leave to file a sur-reply [111]. For the reasons set forth below, the Court grants Defendant's motion for summary judgment [95] on Plaintiff's Counts I and II, and judgment is accordingly entered in Defendant's favor on those counts. The Court also grants Plaintiff's motion for leave to file a sur-reply [111]. Plaintiff's partial cross motion for summary judgment [105] on Count I is denied. Plaintiff's and Defendant's respective cross-motions for summary judgment [113, 115] on Defendant's Counterclaims I and II are each granted in part and denied in part. Judgment is entered in Plaintiff's favor and against Defendant on Defendant's Counterclaim II. The case is set for further status on January 15, 2020 at 9:00 a.m.

**I. Background**

The Court takes the relevant facts from the parties' Local Rule 56.1 statements of undisputed material facts and supporting exhibits: [57], [72–73], [77], [79-1–7], [80], [85], [97], [103], [106], and [108–10]. The Court construes the facts in the light most favorable to the

nonmoving party on any given issue. The following facts are undisputed unless otherwise noted. "When we cite as undisputed a statement of fact that a party has attempted to dispute, it reflects our determination that the evidence cited in the response does not show that the fact is in genuine dispute." *King v. Chapman*, 2013 WL 6709623, at *3 (N.D. Ill. Dec. 16, 2013).

Plaintiff NAR purchased a large parcel ("Parcel") in Naperville, IL in 2006 or 2007. [103 at 3, ¶ 12.] The topographically low-lying land was, at the time, used for farming. [*Id.*] Roughly contemporaneously, Plaintiff contracted with Naperville to excavate another (unrelated) site. [*Id.*, ¶ 13.] Killing two birds with one stone, Plaintiff transported the excavated land to the Parcel, filling it in. [*Id.*] The extent to which Plaintiff measured the soil density in the Parcel is disputed, as are the measures taken to ensure that the land was properly filled. [*Id.*, ¶¶ 14–15.] The quality of excavated soil taken from the other parcel is also in dispute. [108 at 3, ¶ 5.]

Plaintiff contracted with Ozark Automotive Distributors[1] on September 17, 2012; it agreed to sell the Parcel for $5,171,400. [103 at 2, ¶ 10.] The parties also agreed, however, that a condition precedent to the land sale was a construction contract. [*Id.*] The construction contract contemplated a 400,000 square foot automotive distribution center upon the empty Parcel. [*Id.*]; [*Id.*, ¶ 8.] Defendant's distribution centers receive and ship inventory to Defendant's retail stores; these centers generally service dozens of stores. [80 at 8, ¶ 13.]

Before the construction contract was executed, Defendant hired a geotechnical engineering consultant, Terracon Consultants, Inc. ("Terracon"), to test the soil and determine the feasibility of completing a construction project on the Parcel. [103 at 4, ¶ 16.] Terracon tested 24 soil-depths at various locations on the Parcel and submitted a report on March 15, 2013 that summarized its

---

[1] As of January 1, 2014, Defendant O'Reilly Auto Enterprises became the assignee of all of Ozark's interests and obligations in the contract. [71 at 3, ¶ 10.] For ease, the Court refers to the counterparty that negotiated the contract as Defendant.

findings. [*Id.* at 5, ¶ 17]; see also generally [97-6]. Terracon was concerned about the existing fill, finding that the "composition, moisture content and standard penetration test blow counts * * * were variable" and therefore unsuitable for laying foundations for the construction project. See [97-6 at 10]; see also [103 at 5, ¶¶ 18–19]. Terracon recommended that the foundation not be built on the existing fill, and instead opined that "excavations for the building foundations should extend through the fill to the underlying native soils." [103 at 5, ¶ 18]. Terracon also recommended that if these excavations uncovered soft or low-density native soils, then the native soils should be excavated until "suitable bearing soils" were uncovered. [103 at 5, ¶ 19]. The Terracon Report was included in the bidding documents, and Plaintiff admits that it received the report and never objected or requested clarification. [103 at 5–6, ¶¶ 20–21.]

Plaintiff and Defendant executed a construction contract on July 2, 2013. [103 at 3, ¶ 8.] The contract consisted of the "Lump Sum Contract," an addendum, General Conditions, and various architectural Specifications. [72 at 3, ¶¶ 8–9]; [103 at 5, ¶ 21.] The default provisions of the contract placed the risk of loss on Plaintiff: "Contractor at its sole cost, risk, and expense shall construct, supply equipment, provide, purchase, pay for, and furnish all of the Work in accordance with the Contract Documents." [57-1 at 22, Art. 2.] In exchange for providing construction services, Plaintiff was to receive $21,309,412.21. [97-1 at 4, Art. 4.] The parties do not dispute that the contract incorporated structural engineering and architectural "Specifications." [103 at 5, ¶ 21.] Those Specifications, in turn, incorporated the Terracon Report by reference, requiring that the Terracon Report "be included as an integral part of the project specifications. Site preparation and foundation construction shall be in accordance with the recommendations of said report." [103 at 6, ¶ 22; see also generally [97-7]. The contract also included an integration clause, defining the contract documents as the entire agreement between the parties. [103 at 7, ¶ 25.]

Plaintiff began work on the project on August 20, 2013. [72 at 3, ¶ 11.] Almost immediately, Plaintiff ran into trouble with the fill. [103 at 9, ¶ 32.] On August 28, 2013, Plaintiff formally requested that Defendant increase the contract sum in light of the extensive excavations (also called "undercuts") required to conform to the Terracon Report. [*Id.* at 8–9, ¶¶ 30-31]. Two days later, Defendant responded that it would not modify the contract sum because the recommendations of the Terracon Report were well-known when the contract was signed and incorporated by reference as part of the contract itself. [*Id.*, ¶¶ 32–33.] Plaintiff again sought to increase the contract sum in light of the undercutting in September 2013 and was again rebuffed. [*Id.*, ¶ 34]. Plaintiff completed the excavations and continued with its construction. See [108 at 10–12, ¶¶ 19–20, 22, 24.] It is undisputed that in other instances, the contract sum was increased by over $1,000,000 for various changes and modifications. See, *e.g.*, [110 at 2].

Plaintiff had 365 days to complete the work—that is, until August 20, 2014. See [97-1 at 3, Art. 3.1]. Unfortunately, not all of the project components were completed on time. The parties do not dispute that as of August 20, 2014 Plaintiff had not done the following: (1) completed a sidewalk (or issued a bond to the city of Naperville in lieu of completing the sidewalk); (2) completed some landscaping work; (3) repaired an adjacent road; (4) completed an entrance for a neighboring facility; (5) paved a cul-de-sac; and (6) repaved part of a parking lot. [80 at 4, ¶ 10.] The parties dispute whether Plaintiff should be held liable for these delays. [*Id.*, ¶ 9]. The parties also agree that two other tasks—fixing a problem with the "hazardous room" and finalizing the "record drawings"—were outstanding and delayed certification but disagree whether they were within Plaintiff's or Defendant's responsibilities.[2] [85 at 3–4, ¶¶ 5, 6.] Regardless, a permanent

---

[2] On December 28, 2018, Plaintiff submitted a supplemental affidavit from its principal Clayton Olsen (who had previously testified as Rule 30(b)(6) witness) regarding, *inter alia*, whether (1) the delays in completing the project adversely affected Defendant and (2) Defendant was at fault for some of the delays. See

Certificate of Occupancy (CO) was not issued until December 15, 2015. [80 at 7, ¶ 11.] During this lag-time, Defendant sent three letters to Plaintiff complaining that the work had not been substantially completed, and (in some letters) outlining the outstanding work. [73 at 85–91.] Notwithstanding Plaintiff's delays in getting the permanent CO, Plaintiff was able to obtain a *temporary* CO on August 26, 2014 (that is, less than a week after the Contract Date). See [72 at 4–5, ¶¶ 15–16 (disputing that Plaintiff had completed its work by that date, but not disputing that a temporary CO was issued)]. Likewise, Defendant was more-or-less able to get its distribution center up-and-running on schedule. See [*id.*, ¶ 16 ("[Defendant] does not dispute that it could occupy and use the distribution center on August 26, 2014.")]

In July 2017, Plaintiffs sued Defendant in state court for breach of contract,[3] arguing that the extensive undercutting was not within the scope of work. Plaintiffs now seek $334,486.07 for its undercutting work.[4] [104 at 14.] Plaintiff also seeks $103,487.36 that Defendants have withheld in partial satisfaction of its liquidated damages counterclaim (discussed below). Defendant removed to federal court [1] and counterclaimed to enforce the liquidated damages provision in the contract: Defendants seek $2,000 for each day that the permanent CO was delayed after August

---

generally [79-2]. Defendant asked the Court to strike it as a "sham" affidavit designed to gin up a factual dispute. [86 at 9 (quoting *Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162, 1168 (7th Cir. 1996) (explaining that affidavits contradicting prior testimony should be struck))]. Such drastic measures are not necessary. Read in the light most favorable to Plaintiff, the affidavit does not contradict the core of the affiant's prior testimony. In his deposition, Olsen testified that several of the tasks delaying the approval of the permanent CO did not affect Defendant's use of the Parcel, and that *Defendant* was responsible for completing some of the remaining items. See [73, 161:10–173:9]. These are the two key disputed portions of the affidavit. See [79-2 at 1–4, ¶¶ 5–7.] As such, the Court need only read the deposition testimony in the light most favorable to Plaintiff to determine whether material facts are disputed.

[3] Plaintiffs also brought an alternative *quantum meruit* claim. It later acknowledged that a *quantum meruit* claim is not appropriate here. [104 at 20.] Accordingly, Plaintiff's Count II must be dismissed.

[4] Plaintiffs initially sought $210,813.01 for the disputed undercutting. [1-1 at 11, ¶ 18.] With leave of Court [65], Plaintiff amended its complaint to increase this amount in light of its expert's opinion that it suffered even greater damages. See [66].

20, 2014—483 days (and $966,000) in all. [41 at 16, ¶¶ 13–14.] Defendant also wants Plaintiff to indemnify it for any losses it may accrue in Plaintiff's original breach of contract claim and attorneys' fees. [*Id.* at 17, ¶¶ 19–20.]

Before the Court are four cross motions for summary judgment. Defendant seeks full summary judgment [95] on Plaintiff's Claim I; Plaintiff cross moved for partial summary judgment [105] on that claim, arguing that it is at the very least entitled to the withheld funds. Plaintiff has abandoned its Claim II. See [104 at 20]. Plaintiff has also filed a sur-reply on Defendant's motion for summary judgment over Claim I [111]. Plaintiff moved for summary judgment [113] on Defendant's two counterclaims, and Defendant cross moved for summary judgment [115] on those claims as well.

## II.     Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). However, the Court will not draw inferences that are "supported by only speculation or conjecture," *Williams v. Brooks*, 809 F.3d 936, 944 (7th Cir. 2016) (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008)) (internal citations omitted), and "[c]onclusory allegations alone cannot defeat a motion for summary judgment." *Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 892 (7th Cir. 2003). The party seeking

summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).[5]

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Gibbs v. Lomas*, 755 F.3d 529, 536 (7th Cir. 2014) (quoting *Jewett v. Anders*, 521 F.3d 818, 821 (7th Cir. 2008)). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

"Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.' " *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (quoting Fed. R. Civ. P. 56(e)); see also *Anderson*, 477 U.S. at 250. A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The

---

[5] Generally, the Court deals with cross-motions for summary judgment one at a time, construing all facts and drawing all reasonable inference in favor of the non-moving party. *Black Earth Meat Mkt., LLC v. Vill. of Black Earth*, 834 F.3d 841, 847 (7th Cir. 2016). Because the disputed issues in this case center on legal issues, the Court does not do so here. To the extent that inferences could be made, the Court has made inferences in favor of the non-moving party on each issue.

party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex*, 477 U.S. at 323. The Court construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016).

## III.    Analysis

### A.    Plaintiff's Breach of Contract Claim (Claim I)[6]

Plaintiff's Claim I is for breach of contract: Plaintiff alleges that it performed "extra work" by undercutting the soil, and was therefore entitled to payment for those services. Defendant has moved for summary judgment, arguing that the express language of the contract (and documents incorporated by reference) required undercutting the soil, and therefore this work was not "extra." Plaintiff counters that the contract is ambiguous as to the status of the undercuts, and therefore summary judgment is inappropriate. Plaintiff has also moved for partial summary judgment on this count, arguing that irrespective of any ambiguity in the contract, it is entitled to funds withheld by Defendant in partial satisfaction of liquidated damages (discussed below).

"Under Illinois law, in order for a contractor to recover money for 'extra work,' it must show by clear and convincing evidence that the work was 1) outside the scope of the original contract; 2) ordered at the direction of the owner; 3) agreed to be paid for by the owner either by words or by conduct; 4) not voluntarily furnished by the contractor; and 5) not rendered necessary by fault of the contractor." *Brant Const. Co., Inc. v. Metropolitan Water Reclamation Dist. of Greater Chicago*, 967 F.2d 244, 246 (7th Cir. 1992) (reviewing Illinois cases). The argument here

---

[6] As a threshold matter, Plaintiff has filed a sur-reply [111] to address some arguments it claims Defendant improperly advanced. Although (1) whether to grant leave to file surresponses is discretionary, *Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 439 (7th Cir. 1999), and (2) much of the material in the sur-reply is irrelevant or duplicative of the original response, the Court will nonetheless, in an abundance of caution, grant leave to file the sur-reply, and consider it where appropriate.

focuses on the first requirement—whether any "extra work" was outside the scope of the original contract.[7]

The Court turns to Illinois[8] contract law to determine whether the disputed undercutting was within the scope of the contract. "The primary objective in construing a contract is to give effect to the intent of the parties." *Gallagher v. Lenart*, 226 Ill.2d 208, 232 (2007). The language of a contract provides the best indication of that intent. *Id.* (citation omitted); see also *Right Field Rooftops, LLC v. Chi. Cubs Baseball Club, LLC*, 870 F.3d 682, 690 (7th Cir. 2017) (applying Illinois contract law) ("A court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent."). If the contract's language is facially unambiguous, its words "must be given their plain, ordinary, and popular meaning." *Central Illinois Light Co. v. Home Ins. Co.*, 213 Ill.2d 141, 154 (2004). If the contract's language is susceptible of more than one meaning, it is ambiguous and the court can consider extrinsic evidence to determine the parties' intent. *Right Field Rooftops*, 870 F.3d at 690. All portions of a contract should be "construed as a whole, viewing each part in light of the others." *Gallagher* 226 Ill.2d at 233 (citation omitted). In so construing a contract, a court should "attempt to give meaning to every provision of the contract and avoid a construction that would render a

---

[7] The Court need not reach whether Defendant's purported agreement to pay for the excavation is materially in dispute, because excavation of fill and weaker native soils was expressly included in the contract.

[8] Both parties assume that Illinois law applies, but the contract states that Missouri law shall apply. Compare [97-2 at 33, Art. 56 ("The Contract will be construed and interpreted in accordance with the laws of the State of Missouri without regard to conflicts of law.")], with, *e.g.*, [56 at 8 (analyzing Illinois law)]; [71 at 9 (same)]; see also [72, ¶ 7 (suggesting that the contractual choice of law provision is unenforceable)]. Federal courts sitting in diversity apply the choice of law rules of the state in which they sit—in this case, Illinois. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941). Illinois courts apply forum law by default, and "a choice-of-law determination is required only when the moving party has established an actual conflict between state law." *Bridgeview Health Care Center, Ltd. v. State Farm Fire & Cas. Co.*, 10 N.E.3d 902, 909 (Ill. 2014). Here, no party has alleged or established any actual conflict between Illinois and Missouri law, so the Court follows Illinois's first-order choice-of-law rules and applies Illinois law. *Id.*

provision superfluous." *Land of Lincoln Goodwill Indus., Inc. v. PNC Fin. Servs. Grp., Inc.*, 762 F.3d 673, 679 (7th Cir. 2014).

Here, the contract unambiguously required Plaintiff to undercut the existing fill. As explained above, the contract documents included architectural Specifications, which required Plaintiff to hew to the Terracon Report's recommendations when laying the foundation. [103 at 5–6, ¶¶ 21–22]. The Terracon Report, in turn, described the existing fill as "variable" and recommended excavating and replacing all of it. [97-6 at 10–11]. Likewise, the Terracon Report advised that native soils may need to be undercut as well. [*Id.* at 10–11, 15.] In short, the unambiguous terms of the Contract Documents (*i.e.*, the Specifications) required Plaintiff to undercut the fill and weak native soils. Because the undercuts were not "outside the scope of the contract" Plaintiff is not entitled to additional compensation. *Brant Const*, 967 F.2d at 246.

This case is almost identical to a Seventh Circuit case in which the court determined that under-compensated "overexcavation" was not "extra work" when the contract specifications contemplated excavations. See generally *Brant Const*, 967 F.2d at 246. There, the buyer supplied specifications and a geoengineering report containing the "soil borings and soil analyses on which those plans were based. It also provided bidders with the opportunity to conduct further tests of their own." *Id.* at 245–46. The contract in that case provided a per-cubic-yard rate of reimbursement for excavation. *Id.* at 246. Although it later turned out that the "overexcavation" was of a different, costlier nature the contractor anticipated, the Seventh Circuit concluded that the contract settled this issue, and that the contractor could only be reimbursed for the lower, contract price. *Id.* at 247. So too here—the contract expressly required Plaintiff to excavate the Parcel in accordance with the Terracon Report; even if these were costlier or more extensive than Plaintiff anticipated, the Court cannot ignore the parties' intent as reflected in the contract language.

Plaintiff's arguments to the contrary are unconvincing. Plaintiff first argues that there is a conflict between the contract of land sale and the construction contract. [104 at 4–5.] As noted above, the litigants entered into two separate contracts. The land-sale contract provided that the land would be sold "AS-IS." [108, ¶ 1.] Plaintiff argues that this provision saddles Defendant with the risk that contingencies may arise in the construction of the distribution center. [104 at 5.] But the land sale contract required that Plaintiff further contract with Defendant to build a distribution center; that construction contract, in turn, required that construction follow certain protocols, including excavating the extant fill and possibly even excavating weak native soils. [103-3, ¶ 10]; see also [97-7 at 2 (incorporating the Terracon Report)]. If Plaintiff's reading of the words "AS-IS" is correct, then the *entire* construction contract (not to mention the condition precedent within the land sale agreement) is superfluous—Defendant bought an empty lot "as is," so it is entitled to nothing more than an empty lot. The Court cannot accept this interpretation. See *Land of Lincoln Goodwill*, 762 F.3d at 679.

Plaintiff also argues that the requirement that "foundation construction shall be in accordance with the recommendations of [the Terracon Report]" conflicts with other contractual documents, revealing an ambiguity that cannot be resolved on the face of the contract. [104 at 5–7.] Plaintiff points to "Document 003132—Geotechnical Data." See [103-5 at 10]. D003132 is part of the bidding documents and explains that the Terracon Report was provided "for contractor's convenience and [is] intended to supplement rather than serve in lieu of contractor's own investigations." [*Id.*] D003132 states that it (*i.e.*, D003132) is not part of the Contract Documents. [*Id.*] Plaintiff argues that D003132 *is* a Contract Document and its guidance that contractors conduct their own observations conflicts with the Specifications. Plaintiff is not correct, and there is no ambiguity in the integrated contract. As explained above, Article 1 of the Lump Sum Contract

defines the Contract Documents; it unambiguously includes the Specifications (which in turn require that the Terracon Report guide laying the foundation). [97-1, Art. 1]; see also [103, ¶¶ 21–22 (admitting that the Specifications are incorporated into the contract and require adhering to the Terracon Report's recommendations)]. Article 1, however, does not list D003132 as a Contract Document. Plaintiff attempts to get around this by arguing that D003132 was included in a packet of bidding documents, which also included the General Conditions, and therefore is a Contract Document. [104 at 6.] Plaintiff's argument is not pellucid, but it appears to argue that since the General Conditions are part of the Contract Documents, other things that were once stapled to them must be as well. This argument fails, because the General Conditions are a separate, demarcated part of a larger compendium, see generally [103-5], and in any event, D003132 itself says that it is not a Contract Document. Indeed, if D003132 were a Contract Document, then the Court would encounter the logical paradox that D003132 must be taken at its word that it is not a Contract Document.[9]

Next, Plaintiffs argue that the contract requires compensating work remediating "concealed or unknown conditions."[10] [104 at 7–8.] But the contract only requires additional compensation when "concealed physical conditions [] differ materially from those indicated in the Contract Documents."[11] [97-2 at 6, Art. 8.4.] The Contract Documents require that the Terracon Report "be

---

[9] Because the Court concludes that D003132 is not a Contract Document, it need not address Randall W. Bus's expert opinion describing which Contract Documents take precedence. See [103-1, ¶ 7(E)].

[10] Because the Court determines that the weak native soil was not a concealed or unknown condition under Article 8.4, it need not address Defendant's alternative argument that Plaintiff waived its right to seek reimbursement under this Article by not objecting within 21 days. See [107 at 11].

[11] The contract also allows additional payment if the contractor uncovers "unknown physical conditions of an unusual nature, which differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities * * *." [97-2 at 6, Art. 8.4.] Plaintiff has not argued that the soil weakness was unknown, unusual, and materially extraordinary, so the Court will not address this additional prong.

included as an integral part of the project specifications" and that "foundation construction shall be in accordance with the recommendations of said report." [97-7 at 2]; see also [103, ¶ 21–22]. The Terracon Report, in turn, noted that the soil strengths were "variable," and could lead to "unpredictable foundation performance" if not excavated and replaced with engineering fill. [97-6 at 11–12]. Thus, at the very least, the existing fill was not a "concealed physical condition which differ[s] materially from those indicated in the Contract Documents"—to the contrary, the Contract Documents acknowledged the substandard quality of the existing fill. Whether the substandard quality of the native soil is a "concealed or unknown condition" is a slightly closer question. But even there, the Terracon Report discusses the possibility that "lower strength soils, if encountered, will be undercut and replaced." [97-6 at 15.]. The Report concludes that "[n]ew foundations should bear on tested and approved native soils or on newly placed engineered fill." [97-6 at 11.] Plaintiff concedes that the undercuts of native soil were "*into lesser bearing capacity* native soils." [104 at 10 (emphasis added).] Thus, though the native soil quality was concealed at the time of contracting, the soil quality and undercutting did not "differ materially" from anything described in the Contract Documents.[12]

Next, Plaintiff argues that Defendant should have pursued alternative (and purportedly less costly) engineering solutions. Plaintiff points to Specification S1.0, which provides that "if soil of the required bearing capacity or character is not found * * *, the bottom footing elevation will be adjusted." [108, ¶ 34.] Plaintiff claim that this method is less expensive and could have been done instead of excavating the inferior fill and native soils. [104 at 12.] The problem is that the same

---

[12] Plaintiff further argues that it would be illogical and against custom to excavate the plot to determine the soil strength before executing the contract. [103 at 13.] Perhaps so, but the question is not whether contractors customarily excavate, but whether the contract allocates risk. Here, the Contract Documents note that soil may be excavated and do not provide compensation for this contingency. [103 at 5–6, ¶¶ 21–22]. Furthermore, the Contract allocates the risk of encountering inferior soils to Plaintiff. See [57-1 at 22, Art. 2.]; see also *Brant*, 967 F.2d at 248.

Specification requires that "foundation construction shall be in accordance with the recommendations of [the Terracon Report]." [97-7 at 2.] As explained above, the Terracon Report recommends excavating the inferior soil up to the point of suitable native soil and replacing with engineering fill—not adjusting the bottom footing. See [97-6 at 11]. The only reading of this Contract Document that would give effect to every word is that Specification S1.0 required excavating until hard native soil was found—contractors were to adjust the footing only if no suitable, native soil was uncovered. See *Land of Lincoln Goodwill*, 762 F.3d at 679. Plaintiff's alternative argument that there is a common-law duty to replace bargained-for contractual requirements with less expensive alternatives, [111 at 6–7], must also be rejected, both because Plaintiff does not support this argument with a single citation to case law and because this purported duty contravenes the requirement that the plain language of a contract controls.

Finally, Plaintiff argues that Defendant should be estopped from denying that the "extra work" is compensable, because Defendant later encouraged Plaintiff to complete work it formally adjusted the contract sum via "Change Order." [104 at 16.] Plaintiff's argument is not easy to follow, but as far as the Court can tell, even if Defendant's subsequent course of conduct was to approve Change Orders late, every Change Order Plaintiff cites was approved after the Change Order at issue here was denied. Compare [104 at 16 (listing subsequent orders)], with [103, ¶ 33 (admitting that the change order was denied on August 30, just two days after it was submitted).] Thus, Plaintiffs did not rely on Defendant's course of conduct to their detriment. Indeed, the course of conduct (such as it was) was not established until well after Defendants rejected the change order at issue here.

Because Plaintiff has not shown that the work was outside the scope of the contract, it cannot establish that its undercutting was extra. Accordingly, Defendant is entitled to summary

judgment on this count. Plaintiff has also moved for partial summary judgment on this count, but their motion is better conceptualized as an objection to Defendant's sequestration of some outstanding funds in partial reimbursement for the disputed liquidated damages (discussed below).

### B. Defendant's Breach of Contract Claim (Counterclaim I)

Defendant's Counterclaim I seeks to collect almost one million dollars in liquidated damages. The contract provided for a $2,000 per day stipulated penalty for each day that the completion of the project was delayed. Defendant seeks summary judgment, both as to whether the claimed delay constituted a breach and the applicability of liquidated damages. Plaintiff also seeks summary judgment, arguing that the contractual terms are contradictory, and (when properly interpreted) required only that Plaintiff have the facility up-and-running by the Date of Substantial Completion. In the alternative, Plaintiff argues that summary judgment is inappropriate on breach because material facts are in dispute, and it is entitled to partial summary judgment on the enforceability (or lack thereof) of the liquidated damages provision.

### 1. Breach

As explained above, where the language of the contract is unambiguous, that language controls. *Central Illinois Light*, 213 Ill.2d at 154. The Lump Sum Contract requires that the "Date of Substantial Completion" be no later than 365 days after work has commenced. [97-1 at 3, Art. 3.1.] Elsewhere, the contract defines Date of Substantial Completion as "the date certified by [Defendant] when construction is sufficiently complete in accordance with the Contract Documents *and* the permanent CO has been obtained, so that [Defendant] may occupy and use the Work or designated portion thereof for the use for which it is intended." [97-2 at 12, Art. 18 (emphasis added).] The Contract also clarifies that "beneficial use and occupancy" by Defendant "shall not be deemed to be the equivalent of completion." [97-2 at 31, Art. 51.2.]

Defendant's argument is simple: because the permanent CO was not issued until 848 days after the project commenced (*i.e.*, 483 days after the stipulated completion date), Plaintiff breached. Plaintiff counters that another contractual provision controls: "Substantial Completion is the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so that O'Reilly can occupy or utilize the Work for its intended use; provided, however, that as a condition precedent to the Substantial Completion, O'Reilly has received all certificates of occupancy * * * necessary for the beneficial occupancy of the Project." [97-2 at 15, Art. 22.1.] According to Plaintiff, this provision states that temporary CO's satisfy Plaintiff's obligation for Substantial Completion, and it is therefore entitled to summary judgment, or that at the very least it demonstrates the existence of an ambiguity that defeats Defendant's motion for summary judgment.

Defendant has the better argument in regard to whether a permanent CO was required under the terms of the contract. In Illinois, there is no contradiction if "[o]ne [provision] is just more explicit than the other." *BMD Contractors, Inc. v. Fidelity and Deposit Co. of Maryland*, 679 F.3d 643, 652 (7th. Cir. 2012). Even if there is a contradiction, "the more specific provision of a contract governs where it arguably conflicts with a more general provision." *Aeroground, Inc. v. CenterPoint Properties Trust*, 738 F.3d 810, 816 (7th Cir. 2013) (citing *Grevas v. U.S. Fidelity and Guar. Co.*, 152 Ill.2d 407, 411 (1992)). Although Article 22.1 could be read (albeit with some imagination) to suggest that any CO would satisfy the contract, Article 18 clarifies that a *permanent* CO is required. There is no conflict, because this more specific provision controls. *Id.*; see also *15th Place Condominium Ass'n v. South Campus Development Team, LLC*, 14 N.E.3d 592, 600–01 (Ill. App. Ct. 2014) (enforcing similar definition of "Date of Substantial Completion" notwithstanding other, vaguer definitions in the contract). Plaintiff argues that its reading gives

effect to "each clause and word used" in the contract, but that is entirely backwards: Plaintiff's reading nixes the word "permanent" from the contract and therefore is disfavored. *Land of Lincoln Goodwill*, 762 F.3d at 679. In contrast, Defendant's interpretation gives effect to both Article 22.1 and Article 18—Article 22.1 establishes that the Date of Substantial Completion has not arrived until the contractor has obtained "all" the necessary certificates, and Article 18 clarifies which certificate is necessary—the *permanent* CO.[13] Moreover, Article 22.1 indicates that other provisions in the contract documents may impose more stringent requirements, which is exactly what Article 18 does. Because the parties do not dispute that the permanent CO was not obtained until after the Date of Substantial Completion, Defendant is entitled to partial summary judgment on the issue of whether the contract required a permanent CO as a prerequisite to substantial completion.

But Plaintiff's failure to obtain this CO does not necessarily mean that Defendant is entitled to summary judgment on the issue of *breach*. To the contrary: there is one issue of material fact that defeats Defendant's motion. Plaintiff argues that *Defendant* caused some of the delays and should not be allowed to benefit from its own dawdling.[14] Specifically, Plaintiff's Rule 30(b)(6) witness Olsen explained in his testimony that O'Reilly had failed to address an "internal" issue with the "[e]gress to the East from the hazardous room" and finalize approval for the "record

---

[13] Plaintiff's other arguments are even further afield. It argues that the requirement of a "permanent" CO conflicts with language in the contract explaining that such a certificate was necessary for Defendant's full and beneficial use of the facility. This is not contradictory, and in any event, the contract resolves any purported ambiguity by explaining that "occupancy or beneficial use" "shall not be deemed to be the equivalent of completion." [97-2 at 31, Art 51.2.]

[14] Defendant does not contest that if it were responsible for these delays and proper notice procedures had been followed, then the liquidated damages provision would not apply. See [86 at 11]. Since the movant carries the burden of demonstrating that it is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a), the Court infers that arguments about which party is responsible for delay are material.

drawings." According to Olsen, these tasks were in Defendant's hands, and contributed to the delay. [73 at 51, 172:4–173:9]; see also [*id.* at 90–91]. Defendant counters that Plaintiff waived any right to extend its contract period by failing to provide written notice.[15] The contract requires, *inter alia*, "[i]f the [Plaintiff] wishes to make Claim for an increase in the Contract Time, written notice as provided herein shall be given. The [Plaintiff]'s Claim shall include an estimate of costs and of probable effect of delay on progress of the Work." [97-2 at 6, Art. 8.6.]

As explained above, Illinois courts interpret unambiguous contracts according to the ordinary meaning of the words used therein, seeking to arrive at a construction that renders no word or phrase superfluous. *Land of Lincoln Goodwill Indus*, 762 F.3d at 679; see also *Fidelity Nat. Title Ins. Co. of New York v. Westhaven Properties Partnership*, 386 Ill. App. 3d 201, 215 (1st Dist. 2007) (strictly construing unambiguous written notice provision of partnership agreement to require written notice); but see *Myers v. Popp Enterprises, Inc.*, 216 Ill. App. 3d 830, 835 (2d Dist. 1991) (refusing to require written notice when said provision was arguably ambiguous). Here, a strict construction would strain the meaning of the word "notice" and render the second quoted sentence nonsensical. The ordinary meaning of the word "notice" is an "announcement."[16] But here, it would make little sense to require Plaintiff to announce Defendant's own actions to Defendant. Such an announcement would be doubly redundant here, where Defendant sent letters to Plaintiff explaining that (1) it knew these tasks were outstanding and (2) they held up the permanent CO. [73 at 85–91.] Likewise, Plaintiff could not have estimated

[15] Defendant further argues that it sent letters attributing blame to Plaintiff, and Plaintiff never contested the content of those letters. Although Plaintiff admits receiving those letters, Olsen *did* contest the content—at least as it pertained to the hazardous room and the record drawings. See [73 at 51, 172:4–173:9.]

[16] See Merriam–Webster Dictionary, https://www.merriam-webster.com/dictionary/notice (Definitions 1(a) and 1(b)) (Last accessed 12/30/2019).

its costs or the length of delay, because only Defendant knew how long it would take. At a minimum, the provision may be ambiguous because it at least arguably applies to instances where the Defendant was not the explicit cause of delays and its effects. *Myers*, 216 Ill. App. 3d at 835.

Even if the language were unambiguous, however, summary judgment still would be inappropriate under these circumstances. In *Rogers v. Balsley*, the ostensibly breaching party sent written notice to the wrong address—to the counterparty's attorney, as opposed to the counterparty's home address. 240 Ill. App. 3d 1005, 1011 (2d Dist. 1993). Although that mistaken mailing did not comport with the terms of the contract, the Court reasoned that it was close enough, and that it would be inequitable to strictly enforce this provision. Not surprisingly, the attorney passed the notice along to the client. And "[s]ince plaintiffs received notice, in writing, * * * the object of the notice provision was accomplished." *Id.* (citing *Myers*, 216 Ill. App. 3d at 836). Here, Defendant unambiguously had notice of its own failure to complete certain tasks and the consequences for its delays—it even sent its own written notice to the Plaintiff to that effect. See [73 at 85–91]. Thus, the "object of the written notice provision" was accomplished: Defendant knew what was outstanding, and what the consequences were. *Id.*[17] Because Illinois courts would not require strict adherence to a written notice provision under these circumstances, the Court will not do so either. A reasonable jury could believe Olsen over Defendant's letters, so there is an issue of material fact in regard to which party caused the delay in obtaining the permanent CO.

---

[17] Plaintiff's other attempt to generate a material factual dispute is unavailing. Plaintiff argues that the amount of time it had to complete the project is in dispute. It points to a letter from November 2014 that suggests that the contract time had been extended by 3 months. [79 at 10.] Even if, viewing the letter in the light most favorable to Plaintiffs, it constituted a unilateral extension to the agreed upon contract time that would be unenforceable under the "preexisting duty rule." See, *e.g.*, *Gavery v. McMahon & Elliott*, 283 Ill. App. 3d 484, 489 (1st Dist. 1996) ("A release must be based upon consideration which consists either of some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss of responsibility given, suffered or undertaken by the other.") There is no evidence that that this purported release was coupled with a benefit to Defendant or a detriment to Plaintiff, *i.e.*, consideration.

## 2.    Liquidated Damages

In the interest of judicial economy, the Court will examine whether the liquidated damages provision is enforceable. The provision at issue here explains that in the event of a delay, "[t]he exact amount of such damages will be extremely difficult to ascertain. Therefore, [Defendant] and [Plaintiff] agree * * * [Defendant] shall be entitled to retain or recover from [Plaintiff], as liquidated damages and not as a penalty, the following per diem amounts commencing upon the first day following expiration of the Contract Time and continuing until the actual Date of Substantial Completion * * * Two Thousand Dollars ($2,000.00) per day." [97-1 at 3, Art 3.2.]

"The determination of whether a contractual provision for damages is a valid liquidated damages provision or a penalty clause is a question of law." *ICD Publications, Inc. v. Gittlitz*, 24 N.E.3d 898, 920 (Ill. App. Ct. 2014) (quotation marks and citation omitted). Illinois courts will enforce a liquidated damages provision if it passes a three prong test: "(1) the parties intended to agree in advance to the settlement of damages that might arise from the breach; (2) the amount of liquidated damages was reasonable at the time of contracting, bearing some relation to the damages which might be sustained; and (3) actual damages would be uncertain in amount and difficult to prove." *Jameson Realty Group v. Kostiner*, 351 Ill. App. 3d 416, 423 (1st Dist. 2004) (quotation marks and citations omitted) (reviewing leading cases and the Restatement). "In doubtful cases, [Illinois courts] are inclined to construe the stipulated sum as a penalty." *GK Development, Inc. v. Iowa Malls Financing Corp.*, 3 N.E.3d 804, 816 (Ill. App. Ct. 2013); see also *Energy Plus Consulting, LLC v. Illinois Fuel Co.*, LLC, 371 F.3d 907, 909 (7th Cir. 2004).

The provision at issue explicitly states that it is for "liquidated damages and not [] a penalty" and is a "reasonable pre-estimate of damages." [97-1 at 3, Art. 3.2(a).] The first requirement is therefore satisfied, because "[t]he provision evinces the parties' joint effort to fix a

determinable sum as damages at the time of contracting." *John Hancock Life Insurance Company v. Abbott Laboratories*, 863 F.3d 23, 42 (1st Cir. 2017) (applying Illinois law and finding that a less explicit provision satisfied the first prong); see also *Penske Truck Leasing Co., L.P. v. Chemetco, Inc.*, 311 Ill. App. 3d 447, 455 (5th Dist. 2000) ("The inclusion of the term *liquidated damages* indicates to us an arrangement by the parties that takes into consideration the possibility of breach and the necessity to take into account damages for such a breach."). Plaintiff's argument that the contract does not contain a liquidated damages provision thus is belied by the text of the contract itself. Contra [79 at 15].

With regard to the third requirement, Illinois courts regularly conclude that prospective damages in new projects are difficult to prove or uncertain in amount. *John Hancock Life Insurance*, 863 F.3d at 43–44 (collecting "heartland" cases). Plaintiff has not even asserted that, at the time of contracting, it would have been simple to ascertain the extent of damages in the event of delay. See [79 at 16 (arguing that damages were easy to quantify ex-post)]. Thus, Plaintiff has failed to carry its burden on this point. *Ace Hardware Corp. v. Marn, Inc*., 2008 WL 4286975, *14 (N.D. Ill. Sept. 16, 2008) (explaining that under Illinois law, the party seeking to avoid enforcement must "bear the burden of demonstrating that the damages claimed * * * were not difficult or impossible to quantify."). In any event, damages *were* uncertain and difficult to ascertain prospectively. The proposed distribution center was designed to supply parts to local retail stores; presumably, the benefits to Defendant would accrue from improved efficiency in distributing its parts across the Chicagoland area. Any retrospective estimate of damages would have to contend with the individual factors affecting sales and inventory at each store and Defendant's fleet deployment—to the extent that increases in efficiency can be quantified and monetized at all.

The second prong—the reasonableness of the liquidated damages provision—presents a close call. The reasonableness of liquidated damages is analyzed in light of "[t]he purpose of damages[, which] is to place the nonbreaching party in a position that he or she would have been in had the contract been performed, not to provide the nonbreaching party with a windfall recovery." *GK Development*, 3 N.E. 3d at 816 (quotation marks and citation omitted). "The inquiry is prospective, not retrospective: we do not compare the amount derived by application of the liquidated damages formula to a post facto appraisal of the actual damages. Rather, we ask whether 'the amount reasonably forecasts and bears some relation to the parties' potential loss as determined at the time of contracting.' " *John Hancock Life Insurance*, 863 F.3d at 44 (quoting *Karimi v. 401 North Wabash Venture, LLC*, 952 N.E.2d 1278, 1288 (Ill. App. Ct. 2011)). Courts applying Illinois law use a variety of case-specific factors to assess the ex-ante reasonableness of damages. See, *e.g.*, *SMK Associates, LLC v. Sutherland Global Services, Inc.*, 2018 WL 3344540, *6–7 (N.D. Ill. July 9, 2018) (considering (1) "estimate of damages based upon what the parties knew (or did not know) at the time of the contracts' formation;" (2) whether the "figure was, in fact, unreasonable" from an ex-post perspective; and (3) whether the same damages calculation applied to all breaches, "regardless of their severity"); *John Hancock Life Insurance*, 863 F.3d at 44–46 (considering the reasonableness of damages in light of (1) ex-ante uncertainty; (2) "commonsense" economic analysis; and (3) the proportionality of the damages to the breach).

In practice, Illinois courts sometimes refuse to enforce large lump-sum liquidated damages that are triggered by any delay in performance. See, *e.g.*, *GK Development*, 3 N.E. 3d at 817–818 (holding that contractual damages for the entire purchase price for any delay in securing permits was windfall and therefore a penalty); see also *Energy Plus*, 371 F.3d at 910 (applying Illinois law and concluding that similar lump-sum payment for delay was unreasonable). Defendant points out

that reasonable per-diem liquidated damages that vary by the length of delay are generally enforceable. See [71 at 12–15 (discussing *Weiss v. U.S. Fidelity & Guaranty Co.*, 300 Ill. 11 (1921) and *Bethlehem Steel Corp. v. City of Chicago*, 350 F.2d 649 (7th Cir. 1965) (applying Illinois law))]. *Bethlehem Steel* is particularly instructive, as it concerned a contractor who worked on a portion of what is now the Dan Ryan Expressway. *Id.* at 650. The contractor was one of many who worked successively on that portion of the highway, such that any delay would push back future contractors. *Id.* at 650–51. The Seventh Circuit upheld the lower court's enforcement of a per-diem liquidated damages award based on the contractor's delays. Even though the portion of the highway in question opened on time, the court found that the liquidated damages arrangement was reasonable at the time of contracting and the city may have incurred losses as a result of the contractor's delays. *Id.* at 651–52.

Plaintiff argues that the liquidated damages provision in the instant contract is unenforceable because it does not vary with the gravity of its breach. According to Plaintiff, Defendant had full use of the facility very close to the contract date (as evidenced by the temporary CO), and the only outstanding issues were technical in nature and did not interfere with Defendant's use of the property. Defendant counters that the per-diem damage calculation was reasonable at the time of contracting, and is therefore enforceable even if the center opened on time. Both sides are half right. As Defendant contends, the liquidated damages varies upon one axis of breach (the length of delay). But it does not vary upon another, equally important axis— the usability of the facility. As Defendant repeatedly concedes, the contract explicitly recites that liquidated damages accrue even if Defendant has full use of the facility.[18] [85, ¶ 4, 8, 12, 17, 21,

---

[18] *Bethlehem* is quite far afield in this respect. Based on the facts presented in the spare, 55-year old opinion, the stipulated damages related to the prospect that one contractor would exclude the next, delaying further work (and opening). *Bethlehem*, 350 F.2d at 651. Here, however, the contract expressly provides for liquidated damages, even if Defendant is not excluded or otherwise inconvenienced by the delay.

26, 27 ("The extent of [Defendant's] use of its property is not material to whether NAR achieved Substantial Completion.")].

The case at hand, then, is quite similar to *SMK Associates*, 2018 WL 3344540, cited above. In that case, the plaintiff sought enforcement of a liquidated damages provision that entitled it to a 10% refund if the defendant's monthly shipment of cigarettes was late or non-conforming. *Id.* at \*7. Although the stipulated damages provision was somewhat proportional (it varied month-to-month based on the price of the goods), it was "invariant to the gravity of the breach. In particular, "the provision entitles [plaintiff] to 10% of the purchase price whether no cigarettes were delivered, or whether all of the cigarettes were delivered but some did not meet the specifications in any manner. * * * [T]he 10% amount could be assessed whether the monthly delivery were a few days late or not delivered at all." *Id.* (quoting *Checkers Eight Ltd. Partnership v. Hawkins*, 241 F.3d 558, 562 (7th Cir. 2001). So too here. The same penalty was to be assessed whether the distribution center was utterly useless or entirely functional, and was therefore invariant to the gravity of the breach. Such invariance was also known at the time of contracting, because the contract itself requires invariant damages regardless of Defendant's access to and use of the facility. [85, ¶¶ 4, 8, 12, 17, 21, 26, 27]. Finally, even if this is a "doubtful" case, the Court must still "construe the stipulated sum as a penalty." *GK Development*, 3 N.E.3d at 816. Accordingly, Plaintiff is entitled to summary judgment on the unenforceability of the liquidated damages provision.

The Court may now turn to Plaintiff's partial motion for summary judgment on its own Claim I. Plaintiff argues that it is entitled to funds Defendant withheld in partial satisfaction of the anticipated liquidated damages award. Neither party, however, has briefed whether the contract language allowing Defendant to "deduct liquidated damages * * * from any unpaid amounts then

24

or thereafter due [Plaintiff]" [97-1 at 3, Art. 2(b)] would survive this Court's refusal to enforce the liquidated damages provision as written. Accordingly, the Court will refrain from reaching out to decide this issue of Illinois contract law, which may benefit from further briefing or more pointed citations to discovery documents.

* * *

In sum, neither party is entitled to summary judgment on the issue of whether Plaintiff breached by failing to obtain a permanent CO by August 2014. Though the contract required a permanent CO, a disputed issue of material fact exists in regard to whether (and to what extent) Defendant unilaterally caused the delay. That said, Plaintiff is entitled to summary judgment on the unenforceability of the liquidated damages provision.

### 3.    Indemnification (Counterclaim II)

Defendant seeks indemnification for attorneys' fees and any damages it may be on the hook for resulting from Plaintiff's breach of contract claim (that is, the damages Defendant itself caused). It moved for summary judgment on the ground that the contract unambiguously requires that Plaintiff indemnify it. Plaintiff disagrees, arguing that the indemnification clause applies only to damages resulting from personal injury, or does not apply to indemnification claims between parties to the same contract (first-party indemnification).[19]

If an indemnification clause is facially unambiguous, its words "must be given their plain, ordinary, and popular meaning." *Central Illinois Light*, 213 Ill.2d at 154. That said, Illinois courts require that "an indemnity agreement must be given a fair and reasonable interpretation based upon a consideration of all of its language and provisions." *Open Kitchens, Inc. v. Gullo Intern. Development Corp.*, 126 Ill. App. 3d 62, 65 (1st Dist. 1984) (quotation marks and citation omitted).

---

[19] Because the Court concludes that the indemnity provision does not apply to first-party claims, it need not address Plaintiff's *expressio unius* argument regarding personal injury.

The indemnity clause cannot be read in isolation—it must be interpreted with the entire contract. *Id.*; *Allianz Global Corporate and Specialty Marine Ins. Co. v. Host Intern., Inc.*, 2013 WL 1629437, *6 (N.D. Ill. Apr. 16, 2013) (quoting *Gallagher*, 226 Ill.2d at 233).

Although Illinois contract law recognizes the availability of first-party indemnification, whether a contract authorizes such indemnification is fact specific. Absent any language or provisions to the contrary, Illinois courts hold that capacious indemnity provisions may be enforced against parties to the contract. *E.g.*, *Higgins v. Kleronomos*, 121 Ill. App. 3d 316, 321 (1st Dist. 1984) (enforcing an indemnity provision that applied to "all claims" against parties to the contract); see also *Walgreen Co. v. Panasonic Healthcare Corporation of North America*, 2017 WL 6731973,*6–7 (N.D. Ill. Dec. 29, 2017) (applying Illinois law and concluding that indemnification provision that listed different procedures for first- and third-party claims required limited first-party indemnification); *Water Tower Realty Co. v. Fordham 25 E. Superior, L.L.C.*, 404 Ill. App. 3d 658, 666 (1st Dist. 2010) ("[A] party wishing to narrow an indemnification clause to third-party damage is obligated to limit the scope of the clause expressly.") (internal quotation marks and citation omitted).

A contract may *implicitly* limit indemnification to third parties, however, if it contains language inconsistent with first-party indemnification. Thus, blanket indemnification provisions that include a duty to defend generally exclude first-party claims, as it makes little sense to defend a claim against one's self. *Open Kitchens*, 126 Ill. App. 3d at 65 (reasoning that requirement that "[c]ontractor shall defend * * * any actions based [on all claims, damages, losses, liabilities and demands]" is inconsistent with first-party indemnification); but see *Water Tower Realty*, 404 Ill. App. 3d at 666 (1st Dist. 2010) (distinguishing *Open Kitchens* because the indemnity provision separated the duty to defend clause with the word "and," suggesting that the broad indemnification

provision is conceptually separate). Other courts applying Illinois law have refused to enforce capacious indemnity provisions against first parties if the contract "would not make sense if the indemnity provision was intended to cover claims between the parties." See *John Hancock Life Insurance Company v. Abbott Laboratories, Inc.*, 183 F.Supp.3d 277, 326 (D. Mass. 2016) (applying Illinois law and concluding that indemnification provision providing for participation in defense and approval of settlement is inconsistent with first-party claims), reversed in part on other grounds, 863 F.3d 23; *Allianz*, 2013 WL 1629437 at *6 (applying Illinois law and holding that indemnification provision must be read in light of other contractual provisions outlining parties' duties to one another); *Matter of Quantum Chemical Lummus Crest*, 1993 WL 135449, *3 (N.D. Ill. Apr. 29, 1993) (explaining that notwithstanding explicit extension to first-party claims, indemnification procedures requiring notice and duty to defend would be rendered "nonsensical" by extension to such claims, and holding that provision only applied to third-party claims).

The indemnification clause here reads in relevant part:

> To the fullest extent permitted by law, Contractor agrees to defend, indemnify and hold harmless [Defendant], [Defendant]'s representatives and any subsidiary, related or affiliated companies and the officers, directors, agents and employees of each (collectively "Indemnitees"), from and against any and all liabilities, damages, losses, costs, claims, suits, judgments and expenses (including all attorney's fees incurred by indemnities) or demands, including those demands arising from damage to property (including loss of use resulting therefrom) and injuries or death of persons (collectively 'Claims'), notwithstanding any possible negligence, whether sole or concurrent on the part of [Defendant] or any of the Indemnitees, to the extent caused by, or allegedly caused by, or arising out of, or connected with: [] this Contract or the Work of any Subcontract thereunder ([Plaintiff] hereby assuming full responsibility for all the Work and relations with Subcontractors).

> * * *

> The Contractor shall indemni[fy] and hold harmless all of the Indemnitees from and against any costs, and expenses (including reasonable attorneys' fees) incurred by any of the Indemnitees in enforcing any of the Contractor's defense, indemnity, and hold-harmless obligations under this Contract. [97-2, Art 42.]

Here, taken as a whole, the contract is inconsistent with first-party indemnification. Defendant hangs its hat on the "any and all" language, arguing that this unambiguously includes first-party claims. *Higgins*, 121 Ill. App. 3d at 321. But the Court cannot view these three words in isolation, and instead must consider their context within the page-long indemnity clause, which is itself embedded within a 32-page-long section of an even longer contract. Indeed, including first-party claims within the indemnity provision would render nonsensical General Conditions, Article 8, Sections 7 ("Injury or Damage to Person or Property"), 9 ("Waiver of Consequential Damages"), and 10 ("Mandatory Mediation"), which all concern disputes between the parties, and none of which mention indemnity. For example, Section 9's requirement that Plaintiff waive consequential damages claims against Defendant would be simultaneously meaningless and redundant—according to Defendant, Plaintiff will always be on the hook for its own damages, so it would not matter if consequential damages are limited. Moreover, the indemnification provision itself includes a blanket duty to defend, which is not set off in a separate, conceptually distinct clause; this therefore militates against requiring first-party indemnification. Compare *Open Kitchens*, 126 Ill. App. 3d at 65, with *Water Tower*, 404 Ill. App. 3d at 666 (distinguishing *Open Kitchens*). Finally, the parenthetical explaining that Plaintiff assumed responsibility over the work and relations with subcontractors would be rendered superfluous by Defendant's reading of "any and all." If anything, this clarifying language suggests that the indemnity provision chiefly applies to disputes with third parties, *i.e.* subcontractors. The court must read the "any and all" language in light of these other provisions, which themselves "would not make sense if the indemnity provision was intended to cover claims between the parties"—which is to say that the indemnity provision applies to "any and all" *third party* claims. See *John Hancock Life Insurance*, 183

F.Supp.3d at 326; *Quantum Chemical*, 1993 WL 135449 at *3. Accordingly, Plaintiff is entitled to summary judgment on this count.

**IV.     Conclusion**

For the reasons set forth above, the Court grants Defendant's motion for summary judgment [95] and denies Plaintiff's cross-motion for partial summary judgment [105]. Plaintiff's and Defendant's respective cross motions for summary judgment [113, 115] are each granted in part and denied in part. Plaintiff's motion for leave to file a sur-reply [111] is granted. The case is set for further status on January 15, 2020 at 9:00 a.m.

Dated: December 30, 2019

_____
Robert M. Dow, Jr.
United States District Judge